IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

RHONDA CONWAY                                                           PLAINTIFF

v.                       Civil No. 05-5099

JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                          DEFENDANT

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Rhonda Conway, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration denying her application for disability insurance benefits (DIB) under the provisions of Title II and supplemental security income benefits (SSI) under Title XVI of the Social Security Act. The court has before it the appeal brief submitted by the Commissioner (Doc. 9) and the transcript of the social security proceedings.

**Procedural Background:**

Conway protectively filed her applications for DIB and SSI on April 22, 2003. (Tr. 13, 46-48, 188-190). She alleged a disability onset date of August 1, 2002, due to complete hearing loss in the right ear, profound hearing loss in the left ear, the Human Immunodeficiency Virus (HIV), and Hepatitis C. (Tr. 52).

Conway's applications were denied initially and on reconsideration. (Tr. 23-24, 25-26, 192-193, 199-200). She requested a hearing before an Administrative Law Judge (ALJ). (Tr. 36). A hearing was held on June 15, 2004. (Tr. 201-224). Conway appeared and testified. (Tr.

206-220). She was represented by counsel. (Tr. 203). Conway's daughter, Amber Blevins, also testified. (Tr. 220-222).

By written decision dated January 5, 2005, the ALJ found that Conway had severe impairments of Human Immunodeficiency Virus (HIV), Hepatitis C, and hearing loss. (Tr. 14). However, he found no impairment or combinations of impairments met or equaled one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 14). The ALJ the concluded Conway had the residual functional capacity (RFC) to perform light exertional activity. (Tr. 14). He noted Conway could not do work that required excellent hearing and was limited but satisfactory in her ability to relate to coworkers, deal with the public, use judgment, interact with supervisors, deal with work stresses, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (Tr. 14). The ALJ concluded Conway could return to her past relevant work as a production assembler. (Tr. 17). The ALJ therefore found Conway not disabled within the meaning of the Social Security Act. (Tr. 17).

On January 19, 2005, Conway requested a review on the record. (Tr. 7). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied Conway's request for review. (Tr. 2-4).

**Evidence Presented:**

On February 18, 2000, Conway tested positive for the HIV antibody. (Tr. 108). On March 1, 2000, she tested positive for Hepatitis C. (Tr. 112).

On November 13, 2001, Conway was seen at the emergency room at St. Mary's Hospital. (Tr. 122-124). She was complaining of a headache and nausea. (Tr. 122). She reported a history of migraines and after an examination was given an injection of Demerol and Phenergan. (Tr.

123). She was seen at the emergency room again on September 9, 2002, complaining of a headache and nausea. (Tr. 117-120). She reported a past history of migraines. (Tr. 118). At the time, she was taking no medications. (Tr. 118). She had no ride home so could not get a shot for the headache. (Tr. 120). She was instructed to take Vicodin and Phenergan and go home and straight to bed. (Tr. 120).

On August 8, 2002, an HIV progress note stated that Rhonda had not been seen in eighteen months. (Tr. 126). Note was made that her file was going to be transferred to inactive. (Tr. 126).

On May 8, 2003, Conway was seen for an HIV follow-up. (Tr. 125). Her chief complaint was fatigue. (Tr. 125). She was on no medications at the time. (Tr. 125).

On May 21, 2003, Conway completed a supplemental interview outline. (Tr. 66-70). She indicated she could bathe, dress, shave, and take care of her own hair care needs. (Tr. 66). She stated she could do laundry, dishes, change sheets, vacuum/sweep, take out the trash, do home repairs, and wash the car. (Tr. 66). She indicated she could not mow the yard, rake leaves, or do garden work. (Tr. 66). She stated she gets really weak and anything she does wears her out. (Tr. 66). She indicated she could do a little shopping for groceries or clothes and go to the post office. (Tr. 66).

Conway indicated she prepared meals two times a week including making sandwiches, frozen dinners, meats, vegetables, and dishes that required a recipe. (Tr. 67). She stated it took her longer to prepare meals (about an hour) since her disability began and it also tired her out to stand too long. (Tr. 67).

AO72A
(Rev. 8/82)

She can pay bills and count change. (Tr. 67). She can drive but has a hard time seeing at night. (Tr. 67). She stated she is unable to walk for exercise or errands because if she walks too much she gets real tired and weak. (Tr. 67).

She does not use any assistive devices. (Tr. 67). She stated she spent her time attending church, watching television, and listening to the radio. (Tr. 67). She also indicated she spent time with her daughter, her family, and her dog. (Tr. 67).

She indicated she had been forced to quit or been fired from one job because of her disability. (Tr. 67). Her disability interfered with her work because she didn't always feel well and wouldn't go to work. (Tr. 67).

She indicated she suffered from unusual fatigue and had to rest two or more times a day for an hour or two at a time. (Tr. 68). She stated she sometimes goes for three or four days and doesn't feel like getting up. (Tr. 68). She stated she has no energy and is always tired. (Tr. 68). She is so fatigued she doesn't rest well and she indicated that sometimes brings on headaches. (Tr. 68).

When asked what activities caused the pain or symptoms, Conway responded working even part time, going for a little walk, or trying to do house cleaning. (Tr. 68). She stated she could stand or walk for fifteen to thirty minutes before the fatigue occurs. (Tr. 68). When she sits she indicated she could sit for an hour but then she started getting sleepy. (Tr. 68). Doing a lot of chores make her symptoms worse and causes her to have a restless night. (Tr. 68).

Conway indicated she hadn't had to take any medication yet. (Tr. 68). Hot baths, laying down and stretching out relieve her symptoms. (Tr. 68).

AO72A
(Rev. 8/82)

On July 1, 2003, Dr. Linda Green, a medical consultant, completed a physical residual functional capacity assessment. (Tr. 142-149). With respect to exertional limitations, it stated Conway could occasionally lift or carry fifty pounds; could frequently lift or carry twenty-five pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and her ability to push and pull was unlimited other than as shown for lift and/or carry. (Tr. 143). No postural, manipulative, visual, communicative, or environmental limitations were established. (Tr. 144-146). At the time, there was no treating or examining source statement regarding Conway's physical capacities in the file. (Tr. 148).

On July 2, 2003, Jason Evans, a vocational analyst, concluded Conway retained the capacity to perform a full range of medium work. (Tr. 71). He concluded Conway could return to her past relevant work as a machine operator in a factory. (Tr. 71).

An audiogram was performed on Conway on July 14, 2003. (Tr. 152-153). It revealed some hearing loss in the left ear and significant hearing loss in the right ear. (Tr. 152). Her speech discrimination in the left ear was 80%. (Tr. 152).

Conway's hearing was evaluated on October 1, 2003, by Dr. Michael Reese. (Tr. 160-164). Dr. Reese noted that Conway's audiometric evaluation showed a total hearing loss in the right ear and a gradual progressive high frequency neurosensory hearing loss in the left ear. (Tr. 159). It was noted she had an 88 percent discrimination in the left ear which gave her some difficulty with discrimination. (Tr. 159). It was recommended that Conway try a hearing aid in her left ear. (Tr. 159).

On April 17, 2004, Dr. Frank Webb completed a history and diagnosis form regarding his treatment of Conway. (Tr. 172-173). He indicated he had treated Conway for chronic

AO72A
(Rev. 8/82)

depression and periodic severe headaches. (Tr. 172). He had written Conway prescriptions for Alprazolam (used to treat anxiety and panic disorder), hydrocodone (to relieve moderate to severe pain), and Amitriptyline (an anti-depressant). (Tr. 174-176).

On May 24, 2004, Dr. Linda McGhee completed a history and diagnosis form regarding her treatment of Conway. (Tr. 166-167). Dr. McGhee indicated she had treated Conway for HIV, Hepatitis C, depression, anxiety, and deafness in the right ear. (Tr. 166). Dr. McGhee listed Conway's present diagnoses as: fatigue, anxiety, Hepatitis C, HIV, and deafness in the right ear. (Tr. 166). Dr. McGhee indicated fatigue prevented Conway from working at physically taxing jobs. (Tr. 166). Dr. McGhee also noted that anxiety and depression interfere with social and communicative functions and deafness is an impediment to communication. (Tr. 166).

On July 9, 2004, at the request of the Commissioner, Conway underwent a psychological evaluation performed by Dr. Scott McCarty. (Tr. 180-184). The Wechsler Adult Intelligence Scale, Third Edition, revealed Conway was functioning in the borderline range of intelligence. (Tr. 181). Her verbal IQ was 79, performance IQ was 84, and her full scale IQ was 70. (Tr. 181).

On the Minnesota Multiphasic Personality Inventory-2nd Edition (MMPI-2) the "validity scales indicated an invalid profile that suggested a 'fake-bad' profile that indicated an exaggeratedly negative presentation of symptoms or possible deception or malingering." (Tr. 182). On the Beck Depression Inventory Conway failed to complete the inventory so Dr. McCarty "guestimated" between moderate to severe based on the answers she did provide. (Tr. 183). The Beck Anxiety Inventory indicated moderate anxiety. (Tr. 183). However, Dr.

AO72A
(Rev. 8/82)

McCarty also noted that given her results on the MMPI-2 her results on the Beck Depression Inventory and Beck Anxiety Inventory were suspect. (Tr. 183). Based on her clinical interview, observation, and history, Dr. McCarty believed Conway had adjustment disorder with depressed mood subsequent to her physical illness (HIV and Hepatitis C). Dr. McCarty felt her limitations in working were due more to her physical illness and complications than to her adjustment disorder. (Tr. 184).

Dr. McCarty also completed a medical assessment of ability to do work related activities (mental) in connection with his evaluation of Conway. (Tr. 185-186). He noted she had a good ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, and deal with work stresses and unlimited/very good ability to follow work rules, function independently, and maintain attention and concentration. (Tr. 185). He noted no limitations with respect to her ability to adjust to a job. (Tr. 186). He indicated she had a good ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability and a unlimited/very good ability to maintain personal appearance. (Tr. 186). He did note that her depressive episodes in relation to her diagnoses could cause some limitations. (Tr. 186).

At the hearing on June 15, 2004, Conway testified she lives with her daughter, son-in-law, and two year old granddaughter. (Tr. 206). She has lived with her daughter and son-in-law since 2001. (Tr. 219).

Conway testified she was forty-seven and had completed the tenth grade. (Tr. 208 & 206). She had underwent training as a sheet metal worker. (Tr. 206).

AO72A
(Rev. 8/82)

She helps around the house with chores such as laundry. (Tr. 217). However, there are days when she doesn't have the energy to do any of the chores. (Tr. 217).

She watches her granddaughter from about 8:00 a.m. until 2:30 p.m. (Tr. 218). She isn't able to do it everyday. (Tr. 218). Once every couple of weeks, Conway testified her daughter has to take her granddaughter to her other grandmother's or her daughter or son-in-law have to stay home from work. (Tr. 218).

Conway testified she could not return to work in a factory because she cannot hear out of her right ear and is partially deaf in her left ear. (Tr. 208). She testified it would be a working hazard because she could not hear machinery or her supervisor. (Tr. 208-209).

Conway doesn't believe she could work in food service because it would be a health hazard in view of the fact that she is both HIV and Hepatitis C positive. (Tr. 219). She also stated that she wouldn't be able to handle six or eight hours a day in a job like that. (Tr. 2190.

She last worked in May of 2002 in a grocery store first as a checker and then as a manager. (Tr. 207 & 215). She had difficulty hearing them call her over the intercom. (Tr. 215). Conway also testified she had problems standing for long periods of time. (Tr. 216).

Conway indicated she could stand for about thirty minutes but then she needs to stop and rest. (Tr. 216). She indicated this is related to her fatigue. (Tr. 216). She indicated she can walk as long as she doesn't overdo it. (Tr. 216). She does not do her own grocery shopping because it wears her out. (Tr. 216). Conway stated she can lift twenty to twenty-five pounds but could not do it repetitively all day. (Tr. 217).

AO72A
(Rev. 8/82)

Conway indicated she has been deaf in her right ear since the age of two. (Tr. 209). Her left ear has gotten progressively worse. (Tr. 209). Conway indicated she can hear if someone is sitting close to her. (Tr. 209).

Conway indicated she has tested positive for both HIV and Hepatitis C. (Tr. 210). Her treating physician for the HIV is Dr. Linda McGhee at the Washington County HIV Clinic. (Tr. 210). She is not currently undergoing treatment for Hepatitis C. (Tr. 211). However, when she saw Dr. McGhee the week before Conway indicated she was told she would need a liver biopsy because her blood count was really high. (Tr. 211). Conway indicated she hadn't had the biopsy done because she couldn't afford it. (Tr. 211). She indicated she did not have private insurance and had not been able to qualify for Medicaid. (Tr. 211).

When asked what symptoms she had from the Hepatitis C, Conway testified she had a lot of fatigue, backaches, didn't sleep well at night and was depressed a lot. (Tr. 211). Conway indicated she was fatigued four or five days a week. (Tr. 212). On a good day, Conway testified she can do the vacuuming or do dishes and then she has to rest. (Tr. 212). On a bad day, Conway indicated she doesn't even get out of bed. (Tr. 212).

With respect to her back aches, Conway testified it was the lower part of her back that hurts. (Tr. 212). She testified she has back aches five or six days a week. (Tr. 213). On a scale of one to ten, she rated the pain from her backaches as a seven or eight. (Tr. 213).

Conway indicated she has trouble sleeping through the night four or five nights a week. (Tr. 213). She will sleep for an hour and then wake up for an hour and then go back to sleep. (Tr. 213). She also has night sweats and her legs ache a couple of times a week. (Tr. 214).

AO72A
(Rev. 8/82)

Conway testified she also suffers from depression. (Tr. 214). She indicated she sees a general practitioner for her depression and he has prescribed her Xanax and Amitriptyline. (Tr. 214).

Conway's daughter, Amber Blevins, also testified. (Tr. 220-222). Blevins indicated she was twenty-three years old and had a two year old daughter. (Tr. 221). Blevins testified that Conway took care of her daughter every day except the days Conway didn't feel up to doing it. (Tr. 221). Blevins indicated there was about two to four days a month when Conway did not feel up to watching the granddaughter. (Tr. 221).

Blevins testified her mother suffers from fatigue and about once a week will just lay in bed and can't get up. (Tr. 222). In Blevins' opinion, there isn't any kind of a job her mother could do. (Tr. 222).

On September 13, 2004, Sarah Moore, a vocational expert, responded to interrogatories propounded by the ALJ. (Tr. 101-102). In the first hypothetical, Moore was asked to assume:

> a person of the claimant's age, education and work background. This person can occasionally lift 20 lbs. frequently 10. This person can stand/walk for 6 hours and can sit for 6 hours. This person cannot do work that requires excellent hearing. There are no other physical limitations.
>
> This person is more than satisfactory in the ability to understand, remember, and carry out complex instructions, follow work rules, function independently, maintain attention and concentration, and the ability to maintain personal appearance. This person is limited but satisfactory in the ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. This person has no other limitations.

(Tr. 102).

AO72A
(Rev. 8/82)

Moore indicated this person could work as a production assembler. She also indicated this person could perform the following jobs: cleaner/housekeeping, poultry eviscerator, and small products assembler. (Tr. 102).

As a second hypothetical, Moore was asked to assume the same person with the following additional limitations:

> This person can never lift more than 5 lbs. This person suffers from chronic pain and fatigue such that frequent, lengthy, and unscheduled rest periods would be required with the result that the person could not sit, stand, walk long enough in total to complete an 8 hour day on a sustained basis. This person would suffer absenteeism in excess of 4 days per month. This person has no useful ability to relate to co-workers or supervisors, to deal with the public, to maintain attention and concentration, to deal with work stresses, or to understand, remember, and carry out simple instructions.

(Tr. 102). Moore concluded this person could not return to any of Conway's past relevant work and there was no work in the national, regional, or local economies the person could perform. (Tr. 102).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have

AO72A
(Rev. 8/82)

decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work

-12-

experience in light of her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion**:

We first turn to the ALJ's evaluation of Conway's subjective complaints. In disability determinations, credibility assessments are the province of the ALJ. *Onstead v. Sullivan*, 962 F.2d 803, 805 (8th Cir. 1992). This court will not substitute its judgment for that of the trier of fact, *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996), nor will we disturb the decision of any ALJ who seriously considers, but for good reason explicitly discredits, a claimant's testimony of disabling pain. *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993).

In this case, we believe the ALJ adequately evaluated the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) and conclude there is substantial evidence supporting the ALJ's determination that Conway's complaints were not fully credible. As accurately pointed out by the ALJ, Conway's medical treatment at this point consisted primarily of follow-up blood tests and monitoring. Conway's HIV and Hepatitis C were not being actively treated with medication. While she reported suffering fatigue due to these conditions, the ALJ correctly noted that Conway reported being able to engage in various household activities and being able to watch her two-year old granddaughter on an almost daily basis. Conway's treating physician was of the opinion only that Conway could not engage in a physically taxing job because of her fatigue. While there was medical evidence supporting the existence of some fatigue and limitation, there is little in the way of medical evidence supporting the extent of the pain and physical limitation alleged to exist by Conway.

-13-

The "ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to contrary." *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002); *Black v. Apfel*, 143 F.3d 383, 388 (8th Cir. 1998)(upholding denial of benefits where no objective medical evidence supported claimant's subjective pain complaints). The ALJ also properly considered Conway's infrequent treatment for his various impairments. *See e.g., Benskin v. Bowen,* 830 F.2d 878, 884 (8th Cir. 1987). Although Conway testified she did not have insurance and her finances were poor, there is no indication she sought to obtain low-cost or free care. *See e.g., Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999).

We next turn to the ALJ's determination that Conway had the RFC to engage in light work. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. *Id*. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." *Id*.

-14-

In the present case, the ALJ carefully reviewed the medical records, plaintiff's subjective complaints, the plaintiff's testimony regarding her daily activities, and the functional limitations set forth by the physicians. As noted above, the ALJ carefully explained his reasons for discounting Conway's testimony regarding the disabling nature of her physical limitations and associated pain. The ALJ also carefully reviewed all available medical evidence as well as the results of the psychological evaluation. The evidence does not support a finding of greater functional limitations than those found to exist by the ALJ.

**Conclusion**:

For the reasons stated, I recommend that the decision of the Commissioner be affirmed. **The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

Dated this 30th day of May 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)